IN THE MATTER OF THE PETITION OF ELIZABETHTOWN WATER COMPANY FOR AN INCREASE IN RATES.

IN THE MATTER OF ANALYSIS OF EARNINGS OF ELIZABETHTOWN WATER COMPANY.

ELIZABETHTOWN WATER COMPANY, PETITIONER-APPEL-LANT, v. NEW JERSEY BOARD OF PUBLIC UTILITIES, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 4, 1985—Decided November 27, 1985.

J.H. Coleman, J.A.D., filed opinion concurring in part and dissenting in part.

Before MORTON I. GREENBERG, J.H. COLEMAN and LONG, JJ.

*Brendan T. Byrne* and *William R. Holzapfel* argued the cause for appellant (*Carella, Byrne, Bain & Gilfillan and Holzapfel, Perkins & Kelly,* attorneys; *Brendan T. Byrne, William R. Holzapfel, Gwenellen P. Janov* and *Dennis P. Harkawik,* on the brief).

*Helene S. Wallenstein,* Deputy Public Advocate, argued the cause for respondent *Alfred A. Slocum,* Acting Public Advo-

cate (*Alfred A. Slocum,* attorney *pro se; Helene S. Wallenstein* on the brief).

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for respondent Board of Public Utilities (*Irwin I. Kimmelman,* Attorney General, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Bertram P. Goltz,* on the brief).

*Stryker, Tams & Dill* submitted a brief *amicus curiae* for New Jersey Utilities Association, Inc. (*Richard B. McGlynn,* of counsel; *Mark L. Mucci,* on the brief).

The opinion of the court was delivered by

MORTON I. GREENBERG, P.J.A.D.

This matter comes on before this court on appeal from a decision and order of respondent Board of Public Utilities, 62 *PUR*4th 613 ("Board") in a rate case.

The case originated on December 2, 1983 when appellant, Elizabethtown Water Company ("Elizabethtown"), a public utility water company subject to the regulatory jurisdiction of the Board, filed a petition with the Board seeking an increase in rates. Elizabethtown's request was contested by the public advocate and the matter was referred by the Board to the Office of Administrative Law for disposition as a contested case. During the ensuing proceedings it was established that although Elizabethtown had not departed from its filed tariff, it nevertheless had earnings in 1982 and 1983 exceeding its return on equity as authorized by the Board in rate determinations governing Elizabethtown effective January 1, 1982 and January 1, 1983. Indeed Elizabethtown admitted that although it was authorized to receive a return on equity of 14.5% during those years, it had earned 15.69% on average equity in 1982 and slightly over 16% on average equity in 1983. It did appear, however, that notwithstanding these favorable results Elizabethtown was suffering a downturn in its earnings. On July 13, 1984 an administrative law judge issued an initial decision

recommending that Elizabethtown be granted relief. This decision was sent to the Board for review and a final decision.

At about the same time the rate case was proceeding, the Board's staff at its direction was examining Elizabethtown's earnings to ascertain whether they were in excess of those produced by just and reasonable rates. The staff in its inquiry concluded that Elizabethtown's achieved return from January 1, 1982 through July 31, 1984 was $2.2 million in excess of the return contemplated by orders in Elizabethtown's two previous rate proceedings effective January 1, 1982 and January 1, 1983.

Elizabethtown filed a response to the staff report with the Board dated June 28, 1984 disputing certain of its calculations, asserting it would be unfair to consider 1982 and 1983 while excluding its less successful year of 1981 and contending that in any event an adjustment for 1982 and 1983 earnings would be unprecedented retroactive ratemaking. Subsequently Elizabethtown, following discussions with the Board's staff, addressed a letter dated August 28, 1984 to the Board asserting that the staff report substantiated Elizabethtown's contention that the company would have poor earnings in 1984, thus jeopardizing its ability to market new debentures and affecting its fiscal integrity. The company further asserted that the staff and Elizabethtown agreed that its underearnings during 1984 would more than offset its overearnings in 1983. Elizabethtown stated it had agreed with the staff that overearnings of $1,150,000 in 1982 could be offset by applying against them projected 1984 underearnings, to the extent these underearnings were not used to offset 1983 overearnings, and by extending the date new rates approved by the Board would go into effect. However while setting forth a method to treat the overearnings, the company stated that it would be unfair to isolate the 1982 earnings from those of prior years. It contended that its return in 1981 was only 11.15% so when that year was combined with 1982 its return was 13.4%, a rate below that allowed by the Board. It further asserted that it should not be required to suffer an adjustment for 1982 without appropriate

adjustments being given for that portion of the authorized rate of return not achieved for the nine years prior to 1982.

On September 24, 1984 the Board issued its decision and order reciting it "affirms" the initial decision with certain modifications. The Board acknowledged Elizabethtown's need for a rate increase and ordered higher rates to cover a projected revenue deficiency. But it also took the overearnings issue into account and concluded that while Elizabethtown had not been at fault in achieving them, the ratepayers should receive recognition of them to the extent of $1,150,000, the amount acknowledged by the staff and Elizabethtown. The Board determined that the most appropriate way to make the ratepayers whole for this amount was to set it off against the rate increase awarded by the Board. Thus it ruled the new rates would be held in abeyance until the difference in revenues between those that would otherwise be allowed under the new rates exceeded the current rates by $1,150,000. It contemplated that the effective date of the new rates would be about February 1, 1985, a date subject to refinement by Elizabethtown, the staff and the public advocate.

On October 25, 1984 Elizabethtown appealed to this court from the Board's order. The public advocate subsequently cross-appealed. In addition the New Jersey Utilities Association, Inc. has participated in this appeal by filing, with leave of the court, a brief *amicus curiae*. Immediately after appealing, Elizabethtown sought interim relief. By our order of October 31, 1984, entered after a hearing, we granted Elizabethtown's motion and ordered that the imposition of the new rates would not be deferred by reason of the adjustment for the overearnings. Our order provided, however, that depending upon the outcome of this case Elizabethtown might have to refund payments to its ratepayers. In entering this order we considered the obvious fact that unless immediate relief was granted the case could become moot because the time of deferment of the new rates could expire before this case was decided. In fact a tariff was promptly prepared and approved reflecting the

new rates and went into effect on November 9, 1984, subject to the outcome of this appeal.

On this appeal Elizabethtown asserts that the Board's action in deferring the increase is impermissible retroactive ratemaking, depriving it of rates otherwise required to produce a just and reasonable rate of return and thus establishing confiscatory rates. The Utilities Association contends the Board's action is a unilateral assumption of authority to revise retroactively a previously final, approved rate and is thus an illegitimate assumption of authority.

The public advocate contends that Elizabethtown by its letter of August 28, 1984 agreed with the Board's action subsequently taken and thus is bound by it. According to the public advocate had Elizabethtown rejected any consideration being given to the overearnings the Board might have taken action to reduce its rates. It further asserts that in any event the Board has not engaged in retroactive ratemaking but rather its decision and order represents a finding that the rates in effect at the time of its ruling, having been found to be just and reasonable, presumptively continue to be reasonable until the earned return on equity for the current period does not exceed the allowed return on equity. The public advocate further argues that the Board, by reason of the deferment, awarded Elizabethtown a larger increase in the future than would otherwise have been allowed. Overall the public advocate contends the Board acted within its legal authority and pursuant to its equitable duty to protect the ratepayers and to insure that they pay rates that are just and reasonable, but no more.

The Board asserts that by deferring the effective date of the new, higher rates it simply extended the then current rate period to allow earnings above the authorized return to average out in the normal course. It thus claims that it is not engaging in impermissible retroactive ratemaking.

The public advocate's cross-appeal is related to its answer to the appeal. It argues that under the Board's order there is a

linkage between the amount of the award and its effective date so that the Board allowed Elizabethtown higher rates than it would have otherwise permitted had it contemplated that the award would be immediately effective. Thus the public advocate asserts that if we adopt Elizabethtown's position, the case should be remanded to the Board for a redetermination of the relief to be granted Elizabethtown. Accordingly the public advocate states that only if Elizabethtown is successful need we address the cross-appeal.

■ Firstly, we deal with and reject the contention that Elizabethtown consented to the determent of the new rates by its letter of August 28, 1984. While it is true that in the letter Elizabethtown suggested a method to deal with overearnings, in language free of ambiguity it contended that if prior earnings were to be considered the Board should take into account unfavorable years before 1982, a position consistent with its June 28, 1984 response. Elizabethtown never consented to the Board isolating for retroactive consideration a period starting January 1, 1982, a time of favorable earnings. Further we see no merit to the public advocate's contention that but for Elizabethtown's alleged agreement to accept the deferment the Board might have taken earlier action to reduce Elizabethtown's rates inasmuch as the staff report was not rendered until 1984. Thus a prospective reduction at that time could have hardly impacted on Elizabethtown's 1982 and 1983 rates or earnings. Accordingly we must address the larger issue on this appeal of retroactive ratemaking raised by Elizabethtown.

In view of the dispute among the parties as to whether the Board engaged in retroactive ratemaking we think it important to quote the germane portion of the September 24, 1984 decision and order at length. The Board there said:

> A review of the Staff exhibits supplied to and discussed with petitioner [Elizabethtown], as well as petitioner's responses thereto, leads the Board to the inescapable conclusion that petitioner achieved a rate of return on average common equity significantly higher than that permitted by the Board during the rate periods in question. According to Staff's calculations, petitioner in the

1982 rate period achieved excess earnings over the permitted 14.5% rate of return on equity of approximately $2 million in revenues. This analysis also supports the conclusion that a level of overearnings continued through the end of 1983, with a significant downturn in earnings in the first half of 1984. Taking into account the company's submission with respect to earnings through July, 1984, Staff concludes that there has been to date a level of overearnings of approximately $2.2 million in revenues.

. . . .

The Board believes that the ratepayer must be made whole in compensation for a level of charges which, in fact, have exceeded the levels prescribed by the Board. Taking all these factors before us into consideration, the majority of the Board concludes that the ratepayers should receive recognition for over-earnings by petitioner in the amount of $1.15 million. This is the amount with which the Staff and the Petitioner basically agreed, for purposes of possible settlement, during the conferences held on the Board's investigation into over-earnings. The Board believes that this conclusion does not undermine our responsibility to set reasonable rates for the future, as we have done by virtue on the rate order included herein.

The Board further concludes that the most appropriate methodology to make the ratepayers whole with respect to this level of overrecovery, is to set off this amount against the level of rate increase awarded herein, which is necessary to give petitioner an opportunity to achieve in future a reasonable rate of return. We will therefore hold the new rates found to be reasonable in this order in abeyance until the difference in revenues between those that would be received under the new rates, as against those received under current rates, equals $1.15 million. It is anticipated that this recovery should be completed on or about February 1, 1985; the date new rates shall be permitted to go into effect shall be subject to an accounting procedure agreed upon by petitioner, Board's Staff and Rate Counsel, which will determine the exact timing of the implementation of this rate order.

 In reviewing the foregoing decision and order it is appropriate for us to restate certain basic propositions. We, of course, are not empowered initially to fix rates but we do have the authority to review the Board's actions. *In re Intrastate Industrial Sand Rates*, 66 *N.J.* 12, 19–20 (1974). In our review we should consider, among other things, whether the action of the Board violates legislative policies expressed or implied in the act governing it. *See Campbell v. Dept. of Civil Service*, 39 *N.J.* 556, 562 (1963). We further recognize, however, that as ratemaking is a legislative function, if the Legislature sets forth adequate standards, the Board, as the Legislature's agent, is vested with broad discretion in exercising the authori-

ty provided it adheres to the standards. *In re Intrastate Industrial Sand Rates, supra,* 66 *N.J.* at 21.

The Legislature has set the standard for the Board in ratemaking in *N.J.S.A.* 48:2–21(b)(1) by providing that the Board shall fix:

... just and reasonable individual rates ... which shall be imposed, observed and *followed thereafter* by any public utility, whenever the board shall determine any existing rate ... to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential. (Emphasis added.)

Inasmuch as the establishment of a rate is a legislative act it follows that the Board's ratemaking authority is prospective. *See In re Lambertville Rates v. N.J. Bd. Pub. Util. Comm'rs,* 79 *N.J.* 449, 457 (1979); *In re Intrastate Industrial Sand Rates, supra,* 66 *N.J.* at 28. Nor surprisingly the principle that ratemaking is a prospective process is applied ordinarily when utilities seek increases in rates. This principle is applied to deny applications for increase which would permit a utility to recoup past deficiencies in revenues. *In re N.J. Power & Light Co.,* 15 *N.J.* 82 (1954); *see also In re Revision of Rates Toms River Water Company,* 82 *N.J.* 201, 213 (1980). But this rule against retroactive ratemaking may work for as well as against a utility as the Supreme Court explained in *In re Intrastate Industrial Sand Rates:*

And while it was once thought by our courts to be just and reasonable to permit a utility, by a surcharge on newly established rates, to recoup revenue deficiencies which it had suffered in the recent past ... that philosophy, too, has been specifically overruled. [Citation omitted.]

And of course this rule, of looking to the future and not the past, works both ways. In *Los Angeles Gas & Electric Corp. v. R.R. Comm'n of California,* 289 *U.S.* 287, 313, 53 *S.Ct.* 637, 647, 77 *L.Ed.* 1180, 1197 (1933), the Supreme Court held:

Deficits in the past do not afford a legal basis for invalidating rates, otherwise compensatory, any more than past profits can be used to sustain confiscatory rates for the future. [66 *N.J.* at 23]

*See also In re N.J. Power & Light Co., supra,* 15 *N.J.* at 89.

We are satisfied from the Board's decision and order that it engaged in retroactive ratemaking. While the Board

denied it was doing this what it in fact did is manifest from its language:

> ... that the most appropriate methodology to make the ratepayers whole with respect to this level of overrecovery, is to set off this amount against the level of rate increase awarded herein, which is necessary to give petitioner an opportunity to achieve in future a reasonable rate of return. We will therefore hold the new rates found to be reasonable in this order in abeyance until the difference in revenues between those that would be received under the new rates, as against those received under current rates, equals $1.15 million.

In addition the Board ended its order and decision by stating: "[t]herefore, the rate increase permitted herein, will not be permitted to take effect until on or about February 1, 1985, but in no event until verification of the amount of *refund* has been resolved ...." (Emphasis added). It is true that the Board did not in form order a refund, but to Elizabethtown and the ratepayers that was the effective consequence of the order, a result which the Board well understood as it referred itself to the amount of the "refund." Our point is that in determining what was prospectively a just and reasonable rate the Board adjusted for prior results.

In addition to denying that the Board engaged in retroactive ratemaking, the public advocate and attorney general assert that the courts have always applied the rule against retroactivity for the protection of the ratepayer, not the utility, and thus the Board's decision and order should be sustained. They point out that a utility faced with an earnings shortfall may seek rate relief and thus arguably does not need a retroactive increase in that circumstance. *See In re Lambertville v. N.J. Bd. of Pub. Util. Commr's, supra,* 79 *N.J.* at 457; *In re N.J. Power & Light Co., supra,* 15 *N.J.* at 93; *In re New Jersey Power & Light Co.,* 9 *N.J.* 498, 527 (1952). Respondents distinguish a shortfall situation from a case in which a utility is achieving overearnings as in the latter circumstance its ratepayers do not have options similar to those of the utility in the former to obtain rate relief.

As a policy matter there is some force in these arguments. But they overlook the fact that the Board's powers are limited

by *N.J.S.A.* 48:2–21(b)(1) which authorizes it to fix just and reasonable rates which shall be "... followed thereafter by any public utility ...." Thus even though the Board undoubtedly considered its order fair, by effectively applying the decision to a period before its decision and order it departed from the legislative mandate to apply rates after they are fixed.

We also point out that while the Board's order may seem superficially fair, in reality it is not. Elizabethtown in its letter of August 28, 1984 asserted that in the nine years prior to 1982 it did not achieve its authorized rate of return. It is difficult to justify applying the overearnings in 1982 and 1983 to defer the effective date of the 1984 increase while ignoring less favorable results for other years. Further it cannot be urged that the Board simply went back to the effective date of its last rate order as that date was, according to its decision and order, January 1, 1983. In our view if the Board was to consider past results to defer future earnings, it was arbitrary to cut the date off at January 1, 1982. We further point out that to some extent there would not be an identity among the ratepayers who contributed to the overearnings in 1982 and 1983 and those who later benefited from the deferment. Thus if the basic premise of the Board's order that past earnings may be used to adjust (albeit only downward) current rates is true, certain of the earlier ratepayers under the Board's order made payments on behalf of their successors. Inasmuch as the Supreme Court in *In re Lambertville Rates v. N.J. Bd. Pub. Util. Commr's, supra,* 79 *N.J.* at 457 indicated that retroactive increases should be avoided so that new consumers are not called upon to pay a present surcharge for service to prior customers, it follows that retroactive decreases should be avoided so that prior ratepayers do not subsidize their successors.

It is also significant that in certain specific but limited circumstances the Legislature has allowed the Board to take action similar to that which it took here. Under *L.* 1983, *c.* 461, *N.J.S.A.* 48:2–21.11 to 21.13, if an electric utility recovers mon-

ey for certain costs from any insurance carrier or as a result of a legal action or settlement, the recovery may be used to reduce its rates when the Board next fixes them if the Board determines that the costs recovered are being charged to the ratepayers. Further under *N.J.S.A.* 48:2–29.3 and *N.J.S.A.* 48:2–29.4 when the Board has authorized a utility to collect a surcharge to raise a definite amount of money for a specified purpose, it may order the utility to refund any excess collected. Thus when the Legislature has desired to authorize the Board to order refunds or reduce future rates by reason of past events it has expressly done so. The absence of such provisions in *N.J.S.A.* 48:2–21(b)(1) leads us to conclude the Legislature has not vested general authority in the Board to direct refunds or defer increases otherwise appropriate simply because the utility has without fault achieved overearnings.

The Board in its decision relied on *Plainfield, etc., Water Co. v. Bd. Pub. Utility Commrs.*, 117 *N.J.L.* 18 (Sup.Ct.1936) and *Re Narragansett Elec. Co.*, 57 *PUR*4th 549 (R.I. PUC 1984)[1] but these decisions do not support its action. It is true that in *Plainfield* the court permitted the Board retroactively to order refunds of excess amounts collected under a surcharge but only because it found the refund was specifically authorized by *L.* 1935, *c.* 48, the source of *N.J.S.A.* 48:2–29.3 and *N.J.S.A.* 48:2–29.4. *Re Narragansett Elec. Co.* was based on Rhode Island law which seems not have language similar to *N.J.S.A.* 48:2–21(b)(1) providing that rates shall be fixed to be charged "thereafter." Further Rhode Island law vests its regulatory agency with broad refund powers and, contrary to the practice in this State, allows a utility to make a retroactive recovery for costs for events such as severe weather which could not be anticipated. In fact *Narragansett* is no help at all to respondents as the commission there clearly stated that the retroactive adjustments would result in refunds. Thus unlike the

---

[1] We are advised that *Narragansett* has been appealed to the Supreme Court of Rhode Island.

Board here it acknowledged the reality of what it was doing. Finally we point out that while we rely on New Jersey law for our decision, in fact foreign law supports our result. *See In re Cent. Vermont Public Service Corp.* 144 *Vt.* 46, 473 *A.*2d 1155 (Sup.Ct.1984); *South Carolina, Etc. v. Public Serv. Com'n,* 275 *S.C.* 487, 272 *S.E.*2d 793 (Sup.Ct.1980). Indeed the Vermont case clearly demonstrates that deferring an increase is in reality a provision for a refund and is retroactive ratemaking by its statement that "[i]n other words, retroactive ratemaking is a device that enables a utility to balance its accounts for a prior period of time by making a future adjustment in its rates." 144 *Vt.* at 52, 473 *A.*2d at 1158.

In view of our determination on Elizabethtown's appeal we are constrained to consider the cross-appeal. As we have indicated the public advocate contends that there was a linkage between the Board's resolution of the rate issues and the overearnings analysis and in reaching its decision and order the Board took into account the impact that the delay in rate increase would have upon Elizabethtown's financial condition. The public advocate asserts that in doing so the Board took "several tangible steps to mitigate the financial impact on Elizabethtown," resulting in a financial benefit to Elizabethtown. These related to calculation of Elizabethtown's surplus and determination of the test year. Thus the public advocate contends that if we accept Elizabethtown's position that the deferment was unlawful retroactive ratemaking we should remand the matter to the Board for redetermination of the relief to be granted Elizabethtown. We have carefully reviewed this contention and find it difficult to support on the record. We note, however, that the Board in its brief does agree with the public advocate that if we reverse on the appeal we should remand the matter. In the circumstances we have concluded that we should not in the first instance pass on the issues raised in the cross-appeal. Rather the matter should be remanded to

the Board to consider the public advocate's contention. We are confident that the proceedings on the remand will not be used to circumvent the result we have reached.

In conclusion insofar as the decision and order of September 24, 1984 required that the ratepayers be given recognition for the overearnings of $1,150,000 it is reversed and the decision and order of September 24, 1984 shall be deemed effective as of November 9, 1984 when our order of October 31, 1984 for interim relief was implemented. The reversal, however, is subject to the proceedings on the remand which may result in a modification of the decision and order of September 24, 1984. The matter is remanded to the Board for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

COLEMAN, J.H., J.A.D., concurring in part and dissenting in part.

I agree with the majority that the Board may have engaged in retroactive ratemaking. I dissent from the majority's determination that the retroactive ratemaking in the present case was impermissible. I agree with the contention advanced by the Public Advocate and the Attorney General that the rule against retroactive ratemaking is to be applied only when it protects the ratepayer, not the utility. When a utility discovers that an existing rate is not yielding what has been determined to be a reasonable return, "it can act as speedily as it sees fit to move for a correction of inadequate rates...." *In re N.J. Power & Light Co., supra,* 15 *N.J.* at 93. By acting expeditiously, a utility can prevent an existing rate from becoming confiscatory. My conclusion is consistent with the language quoted from *In re Intrastate Industrial Sand Rates, supra,* 66 *N.J.* at 23 which indicates that past profits cannot be used to sustain confiscatory rates for the future. There has been no showing that continuation of the rate fixed by the Board's

order effective January 1, 1983 until February 1, 1985, would be confiscatory. On the other hand, unless the Board's decision is affirmed, the ratepayers would have no recourse for paying utility bills that were unnecessarily high. I find that the Board has followed its broad regulatory function and has exercised its discretion to protect ratepayers; while at the same time, it insured that the rate of return on the utility's equity is not confiscatory. In balancing the interest of the utility and the ratepayers, the Board exercised its "broad discretion, based on the circumstances, to fix an effective date for such increase." *In re Lambertville, supra,* 79 *N.J.* at 457.

When the Board deferred the effective date of its order from September 24, 1984 to February 1, 1985 so that the $1.15 million could be recovered by ratepayers, the net effect was to continue the prior rate until February 1, 1985. In so doing, the Board made the new rate prospective only. Hence, I find compelling the argument that this is not retroactive ratemaking. Even if it is, I would hold that it is not impermissible. Additionally, continuation of the prior rates does not violate *N.J.S.A.* 48:2–21b(1) which requires a utility to follow a rate once it has been fixed by the Board. I read this statute as requiring the utility to follow the rate from its effective date until altered by the Board. I do not interpret this statute as requiring the effective date to coincide with the date on which the Board's order is issued.

Finally, I perceive no substantial problem related to changes occurring within the class of ratepayers between 1982 and February 1, 1985. On balance, the changes which occurred would probably be insignificant. Moreover, the Legislature did not envision any meaningful problem in the changing class of ratepayers when it provided for credits or refunds under *N.J. S.A.* 48:2–21.11 to 21.13.

I would therefore affirm.