577 A.2d 143

TARA NOLAN, AN INFANT BY HER MOTHER, PAULINE NOLAN, AND PAULINE NOLAN AND THOMAS NOLAN, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. LUISITA S. LEE HO, M.D., AND REUBEN DEULOFEU, M.D., DEFENDANTS–RESPONDENTS.

Argued March 26, 1990—Decided July 31, 1990.

*Martin N. Crevina* argued the cause for appellants (*Frank J. Nostrame,* attorney; *Eric F. Frizzell,* on the brief).

*Robert W. Donnelly, Jr.,* argued the cause for respondent Luisita S. Lee Ho, M.D. (*Dughi and Hewit,* attorneys).

*Scott T. Heller* argued the cause for respondent Reuben Deulofeu, M.D. (*Giblin, Combs, Cooney & Conway,* attorneys; *E. Burke Giblin,* on the letter in lieu of brief).

PER CURIAM.

The tragic circumstances underlying this medical malpractice suit do not immediately concern, yet cannot be divorced from, the issue before the Court: whether the trial court acted properly in vacating a final settlement agreement without having first conducted a testimonial hearing.

I.

Plaintiff Pauline Nolan is blind, the result of a binary enucleation to remove malignant tumors during her infancy. Pauline's daughter, Tara, was born on September 22, 1978. When Tara was nearly a year old, she was diagnosed as having bilateral retinoblastoma, "[a] malignant type of tumor arising from the retina ... [that] usually occurs before the third year of life, and ... shows a familial or hereditary tendency." 3 Schmidt's Attorneys' Dictionary of Medicine R–92 (1990).

Because of those malignant tumors, both of Tara's eyes were removed by surgery—the left eye immediately after the diagnosis, the right eye only after radiation and chemotherapy treatment had failed to shrink that tumor. Pauline Nolan testified at trial that until Tara was diagnosed as having malignant tumors, it had never occurred to her that they could be passed

on to a child. According to Pauline Nolan, no doctor had ever indicated to her that the tumors might be congenital.

During her first pregnancy, in 1974, Pauline Nolan consulted Myron S. Soled, M.D., who refused to take her on as a patient. Pauline Nolan testified that Dr. Soled suggested she go to the Margaret Hague Hospital, a high risk center, for counseling. According to Dr. Soled, Pauline Nolan told him that in addition to having had her eyes removed because of malignant tumors, she suffered from "convulsive disorders" and "depressive reaction." Dr. Soled testified that he then consulted with a senior doctor in obstetrics and gynecology, Dr. Zondek Kubes, who suggested that the cause of Pauline Nolan's eye tumors was most likely retinoblastoma. On the advice of Dr. Kubes, Dr. Soled referred Pauline Nolan to the Margaret Hague Hospital, although he did not specifically inform her of the genetic risk to the unborn baby. Pauline Nolan did not go to the Margaret Hague, but instead found another doctor who treated her.

During a later pregnancy, which ended in a miscarriage in July 1975, Pauline Nolan came under the care of defendant Luisita S. Lee Ho, M.D., an obstetrician/gynecologist. In April 1976, Pauline Nolan again became pregnant and again consulted Dr. Lee Ho; that pregnancy produced a son, Brian, who was born without retinoblastoma on November 8, 1976.

The infant plaintiff, Tara Nolan, was born of Pauline Nolan's fourth pregnancy; Dr. Lee Ho again served as Pauline Nolan's obstetrician/gynecologist. Pauline Nolan testified that she had told Dr. Lee Ho that her blindness resulted from malignant tumors, but that neither Dr. Lee Ho nor anyone else had suggested to her that her childhood disease could be transmitted to her children. Pauline Nolan also testified that had she known before she became pregnant that she carried a disease with a fifty-percent chance of being passed on to a child, she would not have had children.

The Nolans brought suit against Dr. Lee Ho and Dr. Reuben Deulofeu, the Nolan's regular pediatrician, on November 2,

1981, asserting that both doctors negligently had failed to advise the Nolans that Pauline Nolan's blindness likely had a genetic cause, thus creating a high risk of blindness to potential children. The Nolans alleged that that failure to warn deprived them of the opportunity to make an informed decision on whether to conceive Tara (wrongful birth), and damaged Tara by failing to prevent her birth (wrongful life).

The matter was ready for trial in May 1984. Shortly before the trial actually commenced, the court, on May 22, 1984, granted partial summary judgment to defendant Lee Ho on the wrongful-life claim, because New Jersey had not recognized that cause of action. *See, e.g., Berman v. Allen,* 80 *N.J.* 421, 404 *A.*2d 8 (1979). At that time the wrongful-birth claim against Dr. Lee was settled for $200,000, and the settlement was placed on the record. On May 23, the trial commenced against Dr. Deulofeu. On May 24, 1984, following direct and cross-examination of Thomas and Pauline Nolan, a settlement offer of $500,000 was made to plaintiffs on behalf of Dr. Deulofeu. That evening, plaintiffs' counsel telephoned the home of defense counsel and indicated to defense counsel's wife that plaintiffs agreed to the offer of settlement that had been made that afternoon.

Defense counsel, however, had become wary because Thomas Nolan had mentioned the name of Dr. Soléd during his testimony on May 24. Until this reference, the defense was unaware of Dr. Soled and had never before heard that name. Defense counsel therefore communicated with Dr. Soled on the morning of May 25. Dr. Soled informed defense counsel that he had advised Pauline Nolan to seek genetic counseling in 1974. Further, Dr. Soled told defense counsel that he had informed plaintiffs' counsel of that history in writing on June 30, 1983, in response to an inquiry from plaintiffs' counsel.

On the same day that Dr. Deulofeu's counsel received this new information, he asked the court in chambers to vacate the settlement and declare a mistrial based on the existence of this

newly discovered evidence that had been "deliberately concealed." The basis for that charge was plaintiffs' answer to a written interrogatory, Interrogatory # 38, from defendants asking Pauline Nolan to "set forth names and current addresses of each and every physician you *have seen* for any purpose whatsoever since 1965." (Emphasis added). She answered: "Since 1965, I have *been treated by* the following physicians: (a) Dr. Connant, Jersey City, New Jersey; (b) Dr. Cosgrove, Jersey City, New Jersey; (c) Dr. Lee Ho." (Emphasis added). Plaintiffs' counsel explained in argument to the trial court that the answer did not include Dr. Soled's name because Pauline Nolan had not been treated by him.

Plaintiffs' counsel also argued that the omission of Dr. Soled's name was not material because Pauline Nolan was never told before 1978 that she had a genetic disease, and that, therefore, "Dr. Soled [was] either grossly mistaken or lying" when he informed defense counsel that he had advised Pauline Nolan to seek genetic counseling and had furnished plaintiffs' attorney with a confirmatory written history.

The trial court concluded that plaintiffs "knowingly attempted to perpetrate a deception," and that "their attorney assisted in the attempt to perpetrate this deception and that he did not speak out." The court granted the motion for mistrial, based on its finding that by withholding information about Dr. Soled's examination of Pauline Nolan, plaintiffs' counsel had committed a fraud on defense counsel regardless of the truth of Dr. Soled's assertions. The court vacated the Deulofeu settlement and directed Dr. Lee Ho's counsel to file a formal motion to vacate her settlement with plaintiffs. On June 15, 1984, after that motion was filed, the court vacated the Lee Ho settlement. In addition, the court referred the matter of the conduct of plaintiffs' counsel to the District VI Ethics Committee (DEC).

On July 8, 1985, plaintiffs brought an action for malpractice against Dr. Soled. That suit was consolidated with the suits against Drs. Lee Ho and Deulofeu. Dr. Soled moved to dismiss

the action on the ground that it was barred by the statute of limitations, *N.J.S.A.* 2A:14-2. At a *Lopez* hearing (*Lopez v. Swyer*, 62 *N.J.* 267, 300 *A.*2d 563 (1973)) it was established that Tara Nolan's doctors at Wills Eye Hospital had informed Pauline Nolan on September 16, 1979, that her eye disease was inheritable, and had also told her that her own doctors should have so informed her. Knowledge of both injury and fault almost six years before having been established, the suit was dismissed as time barred. Following that hearing, Drs. Deulofeu and Lee Ho also moved to dismiss on statute-of-limitations grounds. As a result, the court granted motions to dismiss in favor of all defendants, including Dr. Soled.

Meanwhile, the DEC, after conducting attorney-disciplinary hearings, recommended the complaint against plaintiffs' counsel be dismissed. The DEC found that the facts did not establish that counsel, by failing to name Dr. Soled in the answers to interrogatories, intentionally misled the defense or withheld information. Plaintiffs subsequently moved to reinstate the settlements. That motion was denied. The Appellate Division affirmed the denial of the motion, holding in an unreported opinion that both the vacation of the settlement agreements and the dismissal were proper. The Appellate Division held that because the discovery rules clearly had been circumvented, the trial court had been correct in vacating the settlement agreements. Moreover, the court found no procedural infirmity: "We agree with the trial judge that since the truth or falsity of the letter was not relevant there was no need for a testimonial hearing." Finally, the Appellate Division held that the trial court had correctly dismissed plaintiffs' complaint based on the expiration of the statute of limitations.

We granted certification, 117 *N.J.* 626, 569 A.2d 1330 (1989), limited solely to the question of whether the trial court erred in vacating the settlement agreement without an antecedent hearing.

## II.

A settlement agreement between parties to a lawsuit is a contract. *Pascarella v. Bruck*, 190 *N.J.Super.* 118, 124, 462 *A.*2d 186 (App.Div.), *certif. denied*, 94 *N.J.* 600, 468 *A.*2d 233 (1983). "Settlement of litigation ranks high in our public policy." *Jannarone v. W.T. Co.*, 65 *N.J.Super.* 472, 168 *A.*2d 72 (App.Div.), *certif. denied*, 35 *N.J.* 61, 171 *A.*2d 147 (1961). Consequently, our courts have refused to vacate final settlements absent compelling circumstances. In general, settlement agreements will be honored "absent a demonstration of 'fraud or other compelling circumstances.'" *Pascarella, supra*, 190 *N.J.Super.* at 125, 462 *A.*2d 186 (quoting *Honeywell v. Bubb*, 130 *N.J.Super.* 130, 136, 325 *A.*2d 832 (App.Div.1974)). Before vacating a settlement agreement, our courts require "clear and convincing proof" that the agreement should be vacated. *DeCaro v. DeCaro*, 13 *N.J.* 36, 97 *A.*2d 658 (1953).

Like other contracts, when a settlement is obtained by fraud, the injured party may seek rescission. When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement. *Stamato & Co. v. Borough of Lodi*, 4 *N.J.* 14, 71 *A.*2d 336 (1950). Because defendants are not seeking damages, they need establish only equitable fraud, not legal fraud. In order to prove equitable fraud, a plaintiff must demonstrate a material misrepresentation made with intent that it be relied on, coupled with actual detrimental reliance. *Jewish Center of Sussex County v. Whale*, 86 *N.J.* 619, 625, 432 *A.*2d 521 (1981).

Although the trial court did not explicitly employ an equitable-fraud thesis, its analysis proceeded, properly, along equitable-fraud lines. In deciding to vacate the settlement agreement, the trial court emphasized that plaintiffs had concealed a material fact. The court thus based its decision to vacate on the equitable principle that it would be unfair for the misrepresenting party to benefit from the bargain. The Appellate Division reasoned similarly, emphasizing that there was no

need for a testimonial hearing because the truth or falsity of Dr. Soled's claim was irrelevant to the question of fraud. The Appellate Division found that plaintiffs' lack of candor had "hindered the search for the truth," and found clear prejudice to defendants "whether or not there was a disciplinary rule violation."

Plaintiffs argue that they did not misrepresent, but "openly qualified their answer to a poorly phrased interrogatory," expressly answering a question on physicians "seen" by referring explicitly to physicians "treated by." Plaintiffs thus claim that they answered a slightly different question from the one asked, and that defendants should have been alert to that.

Plaintiffs also argue that they were justified in omitting Dr. Soled's name because he referred Pauline Nolan for high-risk counselling, not genetic counselling, and that the omission was, therefore, not material to defendants' defenses and therefore not genuinely prejudicial. They claim further that because that dispute—whether plaintiffs withheld important information that had a significant bearing on the case—itself constitutes a genuine issue of material fact, its resolution required a testimonial hearing before the settlements were vacated or upheld.

As noted, the two lawsuits settled for a substantial amount— $700,000. Both courts below apparently believed that the fact that Pauline Nolan had merely been seen by Dr. Soled was material and that the truth or falsity of the other information related by Dr. Soled in his June 30, 1983 letter was irrelevant. Moreover, both courts concluded that this information was material in that defendants seemingly would not have settled when they did had they been aware of Dr. Soled and the letter he sent to plaintiffs' counsel.

Whether Dr. Soled ever actually warned Pauline Nolan of genetic risks, or whether she reasonably should have so interpreted his referral for high risk counselling, is unresolved. If Dr. Soled's version is proven to be mere fabrication, then, arguably, plaintiffs did not make a "material misrepresenta-

tion." The critical inquiry, however, is whether the omitted information had a bearing on discovery in general and specifically on the ability of defendants to formulate and prepare their defenses. Further inquiry would focus on whether the omitted information, if true, would have a significant effect on the merits of both plaintiffs' cause of action and defendants' defenses. Those issues must be determined in the context of setting aside or rescinding a settlement. The extent to which defendants were actually misled and their ability to engage in discovery and prepare defenses significantly hindered are matters that can most properly be developed and determined through a hearing.

The cause is remanded to the Law Division for a testimonial hearing consistent with this opinion.

POLLOCK, J., dissenting.

This is a medical malpractice case against two doctors, Luisita S. Lee Ho and Reuben Deulofeu, in which plaintiffs assert "that both doctors negligently failed to advise [plaintiff] that Pauline Nolan's blindness likely had a genetic cause, thus creating a high risk of blindness to potential children." *Ante* at 469, 577 *A*.2d at 144. I agree with the lower courts that defendants need show only that plaintiffs' counsel made a material misrepresentation on which defendants relied, not that he intended to deceive them. As the Appellate Division concluded, the failure to disclose Dr. Soled's name, as plaintiffs' counsel was obliged to do, deprived defendants of the ability to conduct further discovery. Of even greater importance, defendants' knowledge of the existence of Dr. Soled's letter would have had a substantial effect on their willingness to enter a settlement agreement. A testimonial hearing is unnecessary to determine the materiality of the failure of plaintiffs' counsel to disclose that Dr. Soled had previously referred plaintiff Pauline Nolan for genetic or high-risk counselling. Furthermore, I would not require defendants to show that they had been prejudiced, or as the Court states, "whether the omitted infor-

mation, if true, would have a significant effect on the merits of both plaintiffs' cause of action and defendants' defenses." *Ante* at 474, 577 *A.*2d at 147. Consequently, I dissent.

The relevant facts are undisputed. Plaintiff Tara Nolan was born on September 22, 1978, and came under the care of Dr. Deulofeu, a pediatrician. A year after her birth, on September 16, 1979, Tara was diagnosed at Wills Eye Hospital as having bilateral retinoblastoma, "a malignant type of tumor arising from the retina. It usually occurs before the third year of life, and it shows a familial or hereditary tendency." 3 *Schmidt's Attorneys' Dictionary of Medicine* R–92 (1989). Tara's birth followed by five years Pauline's first pregnancy in 1974. When she first became pregnant, Pauline consulted Dr. Myron Soled, who referred her on September 5, 1974, to Margaret Hague Hospital, a high-risk hospital. As plaintiff Thomas Nolan, husband of Pauline and father of Tara, testified, Dr. Soled said "something to [the effect] that I don't believe I can handle the case. I believe you ought to go to the Margaret Hague where you can get some sort of counselling."

That testimony was not elicited until the beginning of the trial, May 24, 1984. It was the first time that Dr. Soled's name had been brought to the attention of Dr. Deulofeu's counsel. That evening plaintiffs' counsel left a message on the answering machine of Dr. Deulofeu's counsel stating that plaintiffs would accept his $500,000 settlement offer made earlier that day. In the meantime, however, the doctor's counsel had called Dr. Soled, who returned the call on the morning of May 25. In that conversation, Dr. Soled said that he had told Mrs. Nolan that he could not treat her and that she should go to the Margaret Hague Hospital for genetic counselling.

Plaintiffs' counsel had known for a year that plaintiff Pauline Nolan had been seen by Dr. Soled. On June 30, 1983, in response to his inquiry, Dr. Soled had written plaintiffs' counsel a letter, stating:

Dear Mr. Nostrame:

Please be advised that this patient—Pauline Nolan, was seen in my office, not taken as a patient. She was advised to go to Margaret Hague Hospital for genetic counseling. She was also advised to be followed in the high risk center at the Margaret Hague Hospital.

Very truly yours,

/s/ Myron Soled, M.D.

Three months after having received the letter, plaintiffs' counsel answered an interrogatory propounded by defense counsel asking plaintiffs for "the names and current addresses of each and every physician you have seen for any purpose whatsoever since 1965." Plaintiffs' counsel failed to include Dr. Soled's name in the answer. For whatever reason, the answer misrepresented the facts. No one has debated, nor could one, the materiality of the omission. Based on that misrepresentation, the trial court set aside plaintiffs' settlement not only with Dr. Deulofeu, but also a $200,000 settlement reached with Dr. Lee Ho two days earlier.

Materiality hinges on one consideration: whether defendants' knowledge that Pauline Nolan had seen Dr. Soled would have substantially affected their willingness to settle. 2 J. Pomeroy, *Equity Jurisprudence* § 898 at 532–34 (5th ed. 1941). I agree with the trial court that "[i]t would have been very important for the defense to know that there is a person who contends that he did refer Mrs. Nolan for genetic counseling." We should not be concerned, as both lower courts observed, with the truth or falsity of Dr. Soled's letter. All that need be known is before us. Plaintiffs' counsel knew that Pauline had seen Dr. Soled and failed to disclose that fact to defense counsel, who relied on that misrepresentation in agreeing to pay $700,000. The immediate response of defense counsel in seeking to rescind the settlement agreement bears silent witness to the materiality of the non-disclosure.

Nor is a hearing necessary to establish that defendants were prejudiced. As we stated in *Jewish Center of Sussex County v. Whale,* "equity looks not to the loss suffered by the victim but rather to the unfairness of allowing the perpetrator to

retain a benefit unjustly conferred." 86 *N.J.* 619, 626, 432 *A.*2d 521 (1981). Fairness in this instance rests not in providing plaintiffs with a hearing to salvage a settlement obtained through misrepresentation, but in relieving defendants of the burden of that settlement.

I would affirm.

Chief Justice WILENTZ and Justices HANDLER, O'HERN, and STEIN—4.

*For reversal and remandment*—4.

*For affirmance*—Justices POLLOCK and GARIBALDI—2.